IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-00189-01-CR-W-DW |
| ) | |
| REYES O. CAMPOS, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Reyes O. Campos' Motion to Suppress Evidence (doc #32). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On May 21, 2013, the Grand Jury returned a one-count indictment against Reyes O. Campos. The indictment charged that on March 6, 2013, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, possessed firearms, to wit, an RG, .22 caliber revolver, and a Smith and Wesson, .38 caliber revolver, each having been transported in interstate commerce.

On February 13, 2014, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Campos was represented by Assistant Federal Public Defender Ronna Holloman-Hughes. The Government was represented by Assistant United States Attorney D. Michael Green. The Government called Officers Matt Phelps and Marlin Gaddy of the Kansas

City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On the afternoon of March 6, 2013, Officer Mike Phelps was working in an off-duty capacity patrolling a neighborhood around Loose Park. (Tr. at 3-4) Officer Phelps was being paid by a homes association to patrol the neighborhood. (Tr. at 3) Officer Phelps testified that he was in a patrol vehicle, that he was in uniform and that he had full police rights. (Tr. at 3-4) Officer Phelps had a police radio in his patrol vehicle. (Tr. at 4)

2. At approximately 5:00 p.m., Officer Phelps overheard a dispatch that caught his attention, that is a call for service in the area he was patrolling. (Tr. at 4) The call was to investigate the need for an ambulance. (Tr. at 5) Officer Phelps advised dispatch that he would respond to the call along with the dispatched officers, Officers Gaddy and Wheeler. (Tr. at 4-5)

3. The patrol vehicle that Officer Phelps was in was equipped with a dash camera. (Tr. at 5) The dash camera is activated anytime the emergency lights are activated in the patrol vehicle. (Tr. at 5) The dash camera was operating when Officer Phelps responded to the call on March 6 at 5:00 p.m. (Tr. at 6) Officer Phelps arrived on the scene prior to Officers Gaddy and Wheeler. (Tr. at 7) The patrol vehicle Officers Gaddy and Wheeler were in was also equipped with a dash camera which was operating when they arrived on the scene a few minutes after Officer Phelps. (Tr. at 7) The two dash camera videos are contained on Government's Exhibit 1. Officer Phelps testified that the audio quality is not very good. (Tr. at 8)

4. When Officer Phelps arrived on the scene, he observed a man lying on the sidewalk with a bicycle lying down on the sidewalk behind him and two females standing by the man. (Tr. at 9-11) Officer Phelps exited his vehicle and walked over to the sidewalk to investigate whether an ambulance was needed. (Tr. at 11) One of the women told Officer Phelps that the man was acting kind of weird. (Tr. at 11) Officer Phelps asked the man on the ground what was going on, why he was lying on the ground, whether he needed an ambulance and what was his name; information Officer Phelps needed to determine what his next course of action might be. (Tr. at 11-12)

5. The man lying on the sidewalk told Officer Phelps that his name was Michael. (Tr. at 13) In response to Officer Phelps' question of whether he needed an

2

ambulance, the man responded, no. (Tr. at 14) In response to a question about the man's ID, Officer Phelps got little to no response and if he did get a response, he could not tell what the man was saying. (Tr. at 13-14) The man was incoherent. (Tr. at 31) Based on Officer Phelps' training and experience, he believed that the man was high on some type of narcotic and that he was going to need medical attention. (Tr. at 14) Officer Phelps testified that it is department policy that if an officer believes a person needs medical attention, that the person be taken to a hospital, even if the person refuses an ambulance, so that a doctor may decide if the person needs medical treatment. (Tr. at 33, 38)

6. Officer Phelps told the man to stand up. (Tr. at 15) Officer Phelps testified that he had enough reasonable suspicion at this point to frisk the man for weapons for officer safety and for the safety of the witness who was still standing there. (Tr. at 15) Officer Phelps thought the man might be under the influence of something. (Tr. at 30) The man stood up and Officer Phelps placed him in handcuffs and frisked him. (Tr. at 15-16) No weapons, contraband nor drugs were found on the man's person. (Tr. at 30-31) Officer Phelps testified that the man (defendant Campos) was not under arrest at this time. (Tr. at 30) Officer Phelps again asked the man if he needed an ambulance. (Tr. at 16)

7. As Officer Phelps was walking the man to his patrol vehicle, Officers Gaddy and Wheeler arrived on the scene. (Tr. at 17, 41) Officer Phelps said to the man, "I'm going to go check your bag, okay?" (Tr. at 17) The man did not say anything. (Tr. at 31) Officer Phelps testified that there was a bag wrapped around the handlebars of the bicycle. (Tr. at 17) Officer Phelps said his intention was to look in the bag for the man's ID, to figure out who he was. (Tr. at 17) The bicycle and the bag were lying on the sidewalk. (Tr. at 17) If the man were taken from the scene, either under arrest or to a hospital for treatment, the officers would have to take custody of the man's bicycle and the bag connected to the bicycle per department policy. (Tr. at 34) The items also would have to be inventoried per department policy. (Tr. at 34)

8. Officer Phelps walked over to the bicycle to move it off the sidewalk and closer to his patrol vehicle because it was impeding pedestrian traffic on the sidewalk. (Tr. at 18) The bicycle was on a sidewalk in a residential neighborhood. (Tr. at 18) Officer Phelps testified that there were a fair amount of walkers and joggers in the area that evening at 5:04 p.m. (Tr. at 18)

9. As Officer Phelps picked up the bicycle, the unzipped canvas bag on the handlebars cinched together, and Officer Phelps was able to look into the bag without touching it. (Tr. at 18, 35) Officer Phelps saw what he believed to be a handgun in the open bag. (Tr. at 18) The bag was very full and the fullness of the bag caused the opening of the bag to be larger than if the bag had been empty. (Tr. at 19) Officer Phelps removed the handgun from the bag in order to make it

safe by removing the bullets and opening the cylinder. (Tr. at 20) Upon removing the handgun from the bag, Officer Phelps immediately observed what he believed to be a second gun underneath the first gun in the bag. (Tr. at 20-21)

10. The first gun recovered by Officer Phelps was an RG .22-caliber revolver loaded with seven rounds of .22-caliber ammunition. (Tr. at 21) The second gun recovered by Officer Phelps was a Smith & Wesson .38 Special revolver loaded with four rounds of .38 Special ammunition. (Tr. at 24) A digital scale with residue and a syringe containing residue and blood were also recovered from the bag. (Government's Ex. 3 at 1)

11. While Officer Phelps was processing the bag, Officer Gaddy was attempting to obtain information from the man (defendant Campos). (Tr. at 24) Officer Gaddy testified that it appeared that the man was under the influence of something. (Tr. at 47) Officer Gaddy did not feel that the man needed medical attention. (Tr. at 47) Officer Gaddy obtained the man's first and last name and date of birth. (Tr. at 24, 42) The officers ran this information through dispatch and were advised that Reyes Campos had no wants or warrants for his arrest, but that he was on supervision for a sexual offense. (Tr. at 24-25) This information indicated to Officer Phelps that Campos might have a prior felony conviction and that procedure then required the officers to contact an investigative detective in the Robbery Unit to have a criminal history check run to verify if Campos was, in fact, a convicted felon. (Tr. at 25) When the information came across the radio that Campos was on supervision for a sexual offense, Officer Phelps asked Campos, "Is that you?" (Tr. at 25-26) Campos responded that he was wrongfully accused in the past of a sexual offense. (Tr. at 26) Officer Phelps asked Campos, "Were you convicted?" and Campos said, "Yes." (Tr. at 26) Officer Phelps called a detective in the Robbery Unit to conduct a criminal history check on Campos. (Tr. at 26)

12. The detective advised that Reyes Campos did have a prior felony conviction and that he should be placed under arrest with an investigative hold and transported to headquarters so the detectives could talk to him. (Tr. at 27) Officer Phelps placed Campos under arrest. (Tr. at 27) At some point, Campos spontaneously uttered that Phelps was infringing upon his Second and Fourth Amendment rights and that he should be able to carry guns. (Tr. at 27) Campos had not been advised of his Miranda rights. (Tr. at 27-28)

13. Shortly after Officer Phelps left the scene, as defendant Campos was being loaded into the patrol wagon for transportation to headquarters, Campos stated that he needed an ambulance so that he could go to the hospital for "neck and back pain." (Tr. at 28, 39) At that point, Officer Gaddy determined that Campos needed medical attention. (Tr. at 47) An ambulance was summoned. (Tr. at 28) Officer Gaddy followed the ambulance to the hospital because Campos was under arrest.

4

(Tr. at 44)

14. At the hospital, a nurse provided Officer Gaddy with a bag containing a white-rock-like substance which had been discovered inside defendant Campos' pants near his groin area. (Tr. at 45) The substance tested positive for methamphetamine. (Tr. at 45-46)

### III. DISCUSSION

Defendant Campos seeks suppression of "all evidence and testimony relating to such evidence that was obtained in violation of Mr. Campos's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution." (Motion to Suppress Evidence (doc #32) at 1) Defendant argues:

> 2) Mr. Campos has a right to be free from unreasonable searches and seizures. U.S. CONST. Amend. IV. Mr. Campos submits that his detention was not lawful under Terry v. Ohio, 392 U.S. 1 (1968) and the frisk of his person was not justified by reasonable suspicion that he was armed. …
>
> The officers had no reasonable suspicion that Mr. Campos was engaged in criminal activity. The 911 call was for help of a person lying on the sidewalk. There was no mention of the person having a weapon or appearing to be a danger.
>
> 3) Mr. Campos submits that the officer's physical manipulation of his bag constituted an unreasonable search of his personal effects. … Although it is beyond dispute that Mr. Campos has a legitimate expectation of privacy in the contents of his personal effects, in this case the officer did not open the bag until after Mr. Campos's arrest. Thus, the other question in this case is whether the officer's physical touching and manipulation of Mr. Campos's personal effects invaded his expectation of privacy in its contents.

\* \* \*

> In this case, the officer's handling of the bag went beyond the type of contact that a person would reasonably expect to occur. The officers asked Mr. Campos if he wanted medical attention and he refused. The officers placed him in handcuffs and frisked him. After it was determined that Mr. Campos had no warrants and no weapons on his person he should have been allowed to pick up his bike and leave.

> The officer then lifted the bike off of the sidewalk and placed it against the patrol car. The bag was on the bike and unzipped itself while the officers were lifting the bike. Because this type of physical manipulation of one's personal effects is aimed precisely at discerning what one has attempted to preserve as private, such action constitutes a search under the Fourth Amendment. …

(Doc #32 at 1-3 and 4-5)

### A. Seizure of Defendant

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. See Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992), cert. denied, 507 U.S. 1011 (1993); United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992); United States v. Jones, 759 F.2d 633, 636 (8th Cir.), cert. denied, 474 U.S. 837 (1985). "A dual inquiry determines the reasonableness of an investigative stop: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting Terry v. Ohio, 392 U.S. 1, 19-20 (1968)).

The record in this case establishes that on March 6, 2013, Officer Phelps and other officers responded to a call to investigate the need for an ambulance. (See Fact No. 2, supra) When Officer Phelps arrived on the scene, he observed a man lying on the sidewalk with a bicycle lying down on the sidewalk behind him and two females standing by the man. (See Fact No. 4, supra) One of the women told Officer Phelps that the man was acting kind of weird. (Id.) Officer Phelps asked the man on the ground what was going on, why he was lying on the ground, whether he needed an ambulance and what was his name; information Officer Phelps testified

that he needed to determine what his next course of action might be. (Id.) Officer Phelps testified that he could not obtain much information from the man, other than that his name was Michael and he did not want an ambulance. (See Fact No. 5, supra) Officer Phelps testified that the man was incoherent. (Id.) Based on Officer Phelps' training and experience, he believed that the man was high on some type of narcotic. (Id.) Officer Phelps told the man to stand up. (See Fact No. 6, supra) The man stood up and Officer Phelps placed him in handcuffs and frisked him for officer safety and for the safety of the witness who was still standing there. (Id.) No weapons were found on the man's person. (Id.)

Reasonable suspicion entails some minimal level of objective justification for making a stop–that is, something more than a suspicion or hunch. See United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Delaney, 52 F.3d 182, 187 (8th Cir.), cert. denied, 516 U.S. 878 (1995). While the original call for service did not suggest any criminal activity, during his investigation of that call, facts became known to Officer Phelps that provided him with a reasonable, articulable suspicion that defendant Campos may have been engaged in criminal activity.[1] Officer Phelps was not acting on a mere hunch. Based on Officer Phelps' training and experience, he believed that the man (whom he could not identify) was high on some type of narcotic. (See Fact No. 5, supra) A bicycle was found lying beside the man. (See Fact No. 4, supra) The first part of the Terry inquiry shows that Officer Phelps was justified in conducting an investigative stop under the circumstances.

---

[1] "It shall be unlawful for any person who is under the influence of … drugs to a degree which renders him incapable of safely driving a vehicle to be physically driving or operating any vehicle within this city." Kansas City, Missouri, Code of Ordinances § 70-302(a). "Every person … riding a bicycle shall have … all of the duties applicable to the driver of any other vehicle." Kansas City, Missouri, Code of Ordinances § 70-687.

As to the second part of the Terry inquiry, "a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)(citing United States v. Jones, 759 F.2d 633, 636-37 (8th Cir.), cert. denied, 474 U.S. 837 (1985)). Protective searches for possible weapons allow for the use of handcuffs. See United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009); United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("a police officer's use of handcuffs can be a reasonable precaution during a Terry stop").

The Court finds that Officer Phelps' actions were reasonable under the circumstances. At the time of the frisk, Officer Phelps was the only officer on the scene. (See Fact Nos. 6 and 7, supra) Officer Phelps believed that the man (whom he could not identify) was high on some type of narcotic. (See Fact No. 5, supra) Officer Phelps' action in frisking defendant was reasonably necessary to protect the officer's personal safety as well as the personal safety of the witness who was still standing there and to maintain the status quo so that the officer could determine whether defendant was engaged in criminal activity. No constitutional violation took place.

    B.    Search of Bag

Contrary to defendant Campos' argument, Officer Phelps was justified in seizing the guns and other items from defendant's bag as the first gun was observed to be in plain view, the second gun was in plain view after the first gun was removed from the bag and then the scale and syringe were recovered. It is settled law that an officer "may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point 3) where the

incriminating character of the item is immediately apparent." United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008)(footnote omitted). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.")

Officer Phelps was justifiably present at the scene as he had responded to a call for service. (See Fact No. 2, supra) Further, defendant was in (and the officers responded to) an area open to the public. Officer Phelps saw a gun in plain view inside an unzipped bag which was attached to the handlebars of defendant Campos' bicycle when Officer Phelps picked up the bicycle to move it off the sidewalk. (See Fact No. 5, supra) Officer Phelps testified that he moved the bicycle off the sidewalk because it was impeding pedestrian traffic on the sidewalk.[2] (See Fact No. 8, supra) The Kansas City, Missouri, Code of Ordinances, section 70-696, provides that "A bicycle parked on a sidewalk shall not impede the normal and reasonable movement of pedestrian or other traffic." The Court finds that the incriminating character of a gun in the unzipped bag of an individual believed to be high on some type of narcotic was immediately apparent[3] to Officer Phelps and that Officer Phelps had a lawful right to access the

---

[2]Even if Officer Phelps had not moved the bicycle because it was impeding pedestrian traffic on the sidewalk, the officers would have moved the bicycle when they transported defendant Campos. Obviously, the officers could not leave an incoherent man whom they believed to be high on narcotics on the sidewalk. Upon taking the man from the scene, be it under arrest or to a hospital for treatment (or even to his home), the officers would have to take custody of the man's bicycle and upon moving the bicycle, the officers would have been in a lawful vantage point to see the gun in plain view inside the unzipped bag which was attached to the handlebars of the bicycle.

[3]The "immediately apparent" requirement means that officers must have "probable cause to believe an item is incriminating." United States v. Green, 560 F.3d 853, 858 (8th Cir.), cert. denied, 558 U.S. 879 (2009). "Probable cause" demands not that an officer be certain, but only that the facts available would warrant a reasonable belief that items may be associated with

9

gun and make it safe.[4]  Upon the seizure of the first gun, Officer Phelps immediately observed a second gun underneath the first gun in the bag.  (See Fact No. 9, supra)  Upon the seizure of the second gun, Officer Phelps then observed and seized a digital scale with residue and a syringe containing residue and blood.  The Court finds the incriminating character of a scale with residue and syringe containing residue and blood was immediately apparent to the officer.  The seizure of the items from the bag was proper.

    C.    Statements

While the government argues that statements made by defendant at the arrest scene should not be suppressed, the Court does not read defendant's motion to suppress as seeking the suppression of any statements, rather the motion seeks the suppression of evidence and any testimony relating to such evidence.  The arguments in the motion relate to the physical evidence contained within the bag.

To the extent that defendant is arguing that any statements defendant made were the result of the "illegal search of Mr. Campos' personal effects"[5] which must be suppressed as fruits of the poisonous tree, such an argument fails.  As set forth above, Officer Phelps was justified in seizing the guns and other items from defendant's bag and in arresting defendant.  Therefore, any statements made by defendant could not be considered a fruit of the poisonous tree.

---

criminal activity.  See United States v. Murphy, 69 F.3d 237, 242 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996).  "A person commits the crime of unlawful use of weapons if he ... knowingly: (1) Carries concealed upon or about his ... person ... a firearm ... readily capable of lethal use; or ... (5) Has a firearm ... readily capable of lethal use on his ... person, while he ... is intoxicated, and handles ... such firearm ... in ... a negligent ... manner ...."  Mo.Rev.Stat. § 571.030.

    [4]The seizure of the gun may also be justified under the public safety exception to the warrant requirement.  See United States v. Pillow, 842 F.2d 1001, 1004 (8th Cir. 1988)(gun in plain view is subject to seizure as a reasonable safety precaution).

    [5](Motion to Suppress Evidence (doc #32) at 5)

## IV.  CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Campos' Motion to Suppress Evidence (doc #32).

The parties are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

> /s/ Sarah W. Hays
> SARAH W. HAYS
> UNITED STATES MAGISTRATE JUDGE